UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN SCHNARR,

                        Plaintiff,                Civil Action No. 16-13618
                                              Honorable Paul D. Borman

v.                                        Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

                        Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [16, 18]

Plaintiff Stephen Schnarr ("Schnarr") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [16, 18], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Schnarr is not disabled under the Act. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [18] be GRANTED, Schnarr's Motion for Summary Judgment [16] be DENIED, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On January 14, 2014, Schnarr filed an application for DIB, alleging a disability onset date of March 31, 2009.  (Tr. 59, 139).  This application was denied at the initial level.  (Tr. 59). Schnarr filed a timely request for an administrative hearing, which was held on September 9, 2015, before ALJ Lawrence E. Blatnik.  (Tr. 26-58).  Schnarr, who was represented by attorney Tara McKenzie, testified at the hearing, as did vocational expert ("VE") Heather Benton.  (*Id.*). On October 22, 2015, the ALJ issued a written decision finding that Schnarr is not disabled under the Act.  (Tr. 9-25).  On September 13, 2016, the Appeals Council denied review.  (Tr. 1-5).  Schnarr timely filed for judicial review of the final decision on October 11, 2016.  (Doc. #1). On March 10, 2017, Schnarr filed a Motion for Summary Judgment.  (Doc. #16).  The Commissioner filed a Motion for Summary Judgment on May 10, 2017 (Doc. #18), and Schnarr did not file a reply.

### B.    Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months,

and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.    Background

#### 1.    *Schnarr's Reports and Testimony*

At the time of the administrative hearing, Schnarr was 53 years old, and at 6' tall, weighed 265 pounds.  (Tr. 31).  He lived in a house with his wife and father.  (Tr. 31-32, 173). Schnarr finished high school and then served in the Navy for almost fifteen years.  (Tr. 32-33, 165).  He completed fork lift repair training.  (Tr. 165).  He last worked full time as a service technician between August 1998 and April 2009.  (Tr. 33, 181).  At this job, he repaired "anything that had an engine," and was required to lift twenty-five pounds frequently and up to over one-hundred pounds.  (Tr. 33-34, 182).  He was laid off from this job "[f]or economic reasons."  (Tr. 34).  He later held a part-time cleaning job at a Catholic school between 2011 and 2013.  (*Id.*).  He left this job because he had to carry a thirty-pound vacuum backpack and felt like his "back wouldn't take it [any]more."  (Tr. 34-35).  For two years after that, he applied to

other mechanical jobs but did not receive a phone call or interview.  (Tr. 35).  Schnarr testified

that his back problems from the last few years would now prevent him from being able to work

on a regular basis.  (*Id.*).  During the hearing, the ALJ asked Schnarr whether he could do a

simple job, like a parking lot attendant, where he could change positions between sitting and

standing as needed but had to be there and paying attention for eight hours a day, five days a

week.  (Tr. 45).  Schnarr responded that "[he]'d have to keep moving" and couldn't remain

standing for eight hours a day without sitting or leaning back.  (*Id.*).  He testified that if he had

that job, he would have to take four fifteen-minute breaks to stretch his back.  (Tr. 47).

Schnarr alleges disability as a result of various physical conditions, including

diverticulitis, prostate cancer, heart disease, three herniated discs in his back, carpal tunnel in

both wrists, and issues with both knees, his left rotator cuff, his blood pressure, and his

cholesterol.  (Tr. 164).  These conditions affect his ability to lift, squat, bend, stand, walk, kneel,

and climb stairs.  (Tr. 178).  Schnarr had diverticulitis surgery in 2008.  (Tr. 36).   His

diverticulitis "flares up" every other month for about one week, during which he could not do the

parking lot attendant job discussed above.  (Tr. 48-49).  He had surgery for prostate cancer in

2012 and testified that he has no residual effects but has to get checkups every three months.

(Tr. 36-37).  He also has to see a cardiologist every three months due to his heart disease, for

which he has had ten stents placed.  (Tr. 37).  He still gets chest pains.  (Tr. 48).  He started

having back problems twenty years ago, when he was in the Navy.  (Tr. 35).  He has lower back

pain that goes down to both legs and has gradually worsened over time.  (Tr. 35, 46).  He has not

had back surgery.  (Tr. 36).  A surgeon Schnarr consulted said that he might be able to fix two of

his discs, but not all three.  (*Id.*).  Schnarr is left handed,[1] and his left hand is numb "24/7"

---

[1] In his Function Report, Schnarr indicated that he is right handed.  (Tr. 178).

because he has "really bad" carpal tunnel.  (Tr. 39).  Carpal tunnel makes it hard for him to feel that he is holding a pen, so his handwriting is "sloppy."  (Tr. 40).  He indicated that he uses a hand brace.  (Tr. 179).  He looked into having surgery on his hand, but the doctor he saw at the Department of Veterans Affairs "said it's getting better."  (Tr. 40).  His knees give out when he uses stairs.  (Tr. 39).

Schnarr indicated in his Disability Report that he takes the following medications: Prilosec and Reglan (for his stomach); Lisinopril (for blood pressure); Plavix, Fenofibrate, Lipitor, Zetia, and Crestor (for cholesterol); aspirin, fish oil, Imdur, Ranexa, and Toprol (for his heart); Flexeril, Vicodin, and Norco (for pain); Venlafaxine (for depression); and Glucophage and Uro-Mag (for sugar).  (Tr. 167, 191, 203).  He testified that they give him no side effects.  (Tr. 38-39).  He doesn't need reminders to take his medications or to take care of his personal needs.  (Tr. 175).  His conditions do not affect his ability to handle money or follow instructions.  (Tr. 176, 178).  He handles stress and changes in routine "as well as [he] can."  (Tr. 179).  He has trouble staying asleep.  (Tr. 41, 174).

Schnarr can walk half a block to one block, sit for half an hour, and stand for about fifteen minutes.  (Tr. 38).  After sitting for half an hour, he has to stand up and move around, stretch his back, or sit in a recliner with his feet up.  (Tr. 47).  Being on his feet aggravates his back pain.  (Tr. 37-38).  If he stands for more than fifteen minutes, his back and legs "start giving out."  (Tr. 46).  Around four times a day, he lays down or uses his recliner to stretch his entire body for fifteen minutes.  (Tr. 47).  He does not lift more than twenty-five pounds because he knows it will hurt his back.  (Tr. 38).  He goes outside weekly and can go out alone.  (Tr. 176-77).  Schnarr has a driver's license and mostly takes local trips to doctor's appointments for himself and his father.  (Tr. 32, 176).  He drove himself to the hearing in Lansing.  (Tr. 32).

Schnarr takes care of his personal needs, including preparing his own meals.  (Tr. 41-42, 174-75).  He does laundry in the basement of his home, and he mows the lawn once a week with a riding lawnmower.  (Tr. 39, 42, 175).  He and his wife go grocery shopping together.  (Tr. 42, 176).  She helps him care for their dog.  (Tr. 174).  The summer before the hearing, he had taken four separate four-hour trips to Manistee, Michigan.  (Tr. 43-44).  Schnarr's hobbies include sitting in the backyard with his dog, fishing, and hunting, although he "doesn't do much hunting anymore because it's too much walking."  (Tr. 44, 177).  He uses a computer.  (Tr. 43).  He does not have problems with social interactions.  (Tr. 177).  Twice a week, he plays cards and watches television with others.  (*Id.*).  He gets along with authority figures "OK."  (Tr. 179).

### 3. *Medical Evidence*

The Court has thoroughly reviewed Schnarr's medical record.  Rather than summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 4. *Vocational Expert's Testimony*

Heather Benton testified as an independent VE at the administrative hearing.  (Tr. 50-57).  The VE characterized Schnarr's past relevant work as an industrial truck mechanic as skilled in nature and medium work, but heavy as performed.  (Tr. 51-52).  She testified that that job would have transferable skills to the light, semi-skilled level – specifically, automotive service technicians and mechanics (35,000 jobs nationally) – and that there would be a moderate adjustment in terms of the tools, work processes, work settings, or industry.  (Tr. 52).

The ALJ asked the VE to imagine a hypothetical individual of Schnarr's age, education, and work experience that could perform light work but could lift or carry twenty pounds occasionally and ten pounds frequently; sit, stand, or walk for at least six hours in an eight-hour

6

workday; perform frequent handling or fingering with the left dominant hand; perform only occasional climbing of any sort; perform only occasional balancing, stooping, kneeling, crouching, crawling; would need to avoid any work that involves exposure to dangerous unprotected machinery and work at unprotected heights; would be limited to occasional exposure to dust, odors, fumes, pulmonary irritants, as well as occasional exposure to extreme cold and only occasional use of vibratory materials. (Tr. 53). The VE testified that this hypothetical individual would not be capable of performing the past relevant work nor any jobs that would have transferrable skills, such as an automotive service technician. (*Id.*). But, in the VE's opinion, the hypothetical individual could perform the unskilled jobs of material handler (40,000 jobs), inspector (100,000 jobs), and hand packager (200,000 jobs).[2] (Tr. 54).

The ALJ then asked the VE to imagine a hypothetical individual with the same limitations as in the previous example but with the following additional limitation: the individual needs frequent position changes from standing to sitting and vice versa (every twenty to thirty minutes for three to five minutes at a time). (*Id.*). The VE testified that this would result in a fifty percent reduction in the jobs she listed in the first hypothetical. (Tr. 55).

Next, the ALJ asked the VE to consider a medical source statement prepared in January 2014 by Indrani Nimmagadda, M.D. (*Id.*). The ALJ asked the VE whether an individual with the restrictions described by Dr. Nimmagadda could do any of the previously-identified jobs or any other work at the light exertional level. (*Id.*). The VE responded that Dr. Nimmagadda's opinion that the individual can only work two to four hours a day would preclude all work. (*Id.*).

---

[2] The VE later testified that in these unskilled jobs, usually the maximum time allowed off-task is about ten percent and any more than two absences per month on a consistent basis would result in disciplinary action and possibly termination. (Tr. 57). She also testified that if the individual was off-task four to five times in the workday, the individual would have to fit those breaks in during the two normal breaks given in the morning and afternoon and within the lunch period "in order to make it within the normal competitive realm." (Tr. 56-57).

Similarly, the VE testified that any competitive employment would be ruled out by Dr. Nimmagadda's opinion that (1) the individual is unable to perform a sedentary and low-stress job full time; and (2) in a single workday, the individual could stand and walk sixty minutes and sit for sixty minutes, which adds up to less than two to four hours.  (Tr. 56).

The VE stated that her testimony is consistent with the Dictionary of Occupational Titles ("DOT"), except for the portion regarding a sit/stand option, which is not covered by the DOT and is therefore based on her education and experience.  (*Id.*).  She indicated that she also relied on the Occupational Employment Quarterly in providing her testimony.  (*Id.*).

### D.      The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Schnarr did not engage in substantial gainful activity since March 31, 2009.  (Tr. 14).  Next, he found that Schnarr has the severe impairments of coronary artery disease ("CAD") and history of myocardial infarction with stent placement, degenerative disc disease of the cervical and lumbar spine, osteoarthritis of both knees, chronic obstructive pulmonary disease ("COPD"), and hypertension.  (*Id.*).  At Step Three, the ALJ found that Schnarr's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 14-15).

The ALJ then found that Schnarr retains the residual functional capacity ("RFC") to perform light work, with the following additional limitations:  he can lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; he can sit, stand, or walk six hours each in an eight-hour workday but needs to alternate positions every twenty to thirty minutes for three to five minutes at a time; he can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds; he can frequently handle and finger with both hands;

he must avoid exposure to unprotected heights and dangerous unprotected machinery; and he is limited to occasional exposure to vibration, extreme cold, and pulmonary irritants such as dusts, odors, and fumes.  (Tr. 15).

At Step Four, the ALJ concluded that Schnarr cannot perform his past relevant work as a medium to heavy skilled industrial truck mechanic.  (Tr. 19).  At Step Five, the ALJ found that considering Schnarr's age, education, work experience, and RFC, he can perform the following jobs that exist in significant numbers in the national economy:  material handler, inspector positions, and packer.  (Tr. 20).  As a result, the ALJ concluded that Schnarr is not disabled under the Act.  (*Id.*).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's

decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

## F.    Analysis

In his motion for summary judgment, Schnarr argues that:  (1) the ALJ violated the "treating physician rule" by giving greater weight to the opinion of a non-examining medical

consultant over the opinions of two treating physicians; and (2) the ALJ erred by failing to account for Schnarr's carpal tunnel syndrome and its effect on his ability to work.   These arguments are addressed below.

1.      *The ALJ did not Violate the Treating Physician Rule*

Schnarr argues that the ALJ violated the treating physician rule by not adopting the opinions of Schnarr's treating physician, Dr. Nimmagadda, and his treating cardiologist, Mark A. Rasak, D.O., while giving the "greatest weight" to the opinion of Stage agency non-examining medical consultant, R. H. Digby, M.D.   (Doc. #16 at 16).   Schnarr believes that proper application of the treating physician rule "should have resulted in the according of controlling weight to the opinions of Drs. Nimmagadda and Rasak."   (*Id.* at 17).   Furthermore, Schnarr concludes that the ALJ did not provide "good reasons" for rejecting their opinions.   (*Id.* at 22).

"Generally, the opinions of treating physicians are given substantial, if not controlling, deference," but they "are only given such deference when supported by objective medical evidence."   *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) and 20 C.F.R. § 404.1527(d)(2)).   Thus, an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"   *Blakley*, 581 F.3d at 406 (internal quotations omitted); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996).   However, it is "error to give [a treating source] opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.   SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996).   Accordingly, "the Sixth Circuit has held that '[a]n [ALJ] may give more weight to the opinions of examining

or consultative sources where the treating physician's opinion is not well-supported by the objective medical records.'" *Kilkolski v. Comm'r of Soc. Sec.*, No. 14-cv-14700, 2016 WL 6080217, at *9 (quoting *Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 428 (6th Cir. 2014)), *report and recommendation adopted*, 2016 WL 1357900, at *6 (E.D. Mich. Apr. 5, 2016).

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2) (establishing that the ALJ must "give good reasons" for the weight given to a treating source opinion)). "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). Ultimately, "[t]his procedural 'good reason' rule serves both to ensure adequacy of review and to permit the claimant to understand the disposition of his case." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550-51 (6th Cir. 2010) (citing *Rogers*, 486 F.3d at 242). That a treating physician's opinion is inconsistent with the record constitutes a "good reason" for not giving controlling weight to it. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 417-18 (6th Cir. 2011).

### a. Dr. Nimmagadda's Opinion

On January 21, 2014, Dr. Nimmagadda filled out a medical source statement regarding Schnarr's limitations. (Tr. 236). Dr. Nimmagadda indicated that Schnarr's diagnoses were CAD

(status post ten stents, as recently as October 22, 2013) and back pain from degenerative disc disease. (*Id.*). She opined that Schnarr could work two to four hours per day, stand for fifteen minutes at one time, walk one block at a time, walk and stand for sixty minutes during the workday, sit for thirty minutes at one time, sit for sixty minutes in a workday, and lift ten pounds frequently and twenty pounds occasionally. (*Id.*). She further opined that Schnarr could occasionally bend, stoop, balance, and perform fine and gross manipulation with both hands and that he could frequently raise both arms over shoulder level. (*Id.*). She opined that Schnarr does not need to elevate his legs during an eight-hour workday. (*Id.*). In her opinion, Schnarr suffers from pain that is moderate to severe. (*Id.*). When asked if there are any non-exertional limitations that would interfere with his ability to work, Dr. Nimmagadda listed fatigue, angina, and back pain. (*Id.*). Finally, when asked if Schnarr is capable of performing a sedentary low-stress job on a regular and sustained basis in a forty-hour workweek, she circled "No." (*Id.*).

The ALJ specifically considered Dr. Nimmagadda's opinion, evaluating it as follows:

> This opinion is not well supported by the treatment notes indicating that [Schnarr's] heart condition improved and even with exacerbations, test results, including a stress test, often were negative. [Dr. Nimmagadda] also noted an abnormal lumbar spine MRI but initially prescribed pain medication to be used only as needed and added exercise for his ongoing pain complaints that had relatively little signs, including negative straight-leg raising and a normal gait. . . . Therefore, I give this unreasonable opinion little weight.

(Tr. 19).

### i.  Heart Condition

Schnarr takes issue with the ALJ's decision to give Dr. Nimmagadda's opinion little weight based on the conclusion that, as to Schnarr's heart condition, his test results "often were negative." (Doc. #16 at 18). But rather than point to "positive" test results, Schnarr counters this by simply stating that he had "numerous cardiac procedures," ten stents implanted, and

"'significant in-stent debris as well as some calcification from prior angiograms,' which complicated the placement of the last of the stents."[3]   (*Id.*).   Schnarr argues that "[t]his treatment history alone suggests that [Schnarr] is far from the picture of cardiac health the ALJ would portray."   (*Id.*).   In doing so, Schnarr overlooks that while the ALJ recognized his CAD and myocardial infarction to be "severe" impairments, his ultimate task was to determine Schnarr's functional abilities in light of those impairments.

The ALJ satisfied the "good reasons" requirement because he explained that Dr. Nimmagadda's opinion regarding Schnarr's limitations was not supported by the evidence in the record, including her own treatment notes and those of Dr. Rasak.   For example, the ALJ noted that in November 2008, Schnarr denied chest pain and Dr. Nimmagadda recorded that he had a regular heart rate and that his blood pressure was 134/90.   (Tr. 16).   The ALJ considered that Schnarr reported "only episodes of chest pain" that had improved in March 2009, and that in April 2009, he had recently visited the hospital due to chest pain but his test results were negative.   (*Id.*).   He complained of a headache and Dr. Nimmagadda found that his sinuses were tender, but his blood pressure was 120/80.   (*Id.*).   Although Schnarr complained of chest pain in September 2009, Dr. Nimmagadda noted the day before that his results from a stress test were

---

[3] The Court notes that the same October 22, 2013 record that mentions "in-stent debris" and "some calcification" concludes by reporting that

> [a]t the end of the [cardiac] procedure and [when] the final result was noted, the patient had an excellent result with 0% residual, TIMI 3 flow and no dissection.   There was excellent blush distally. . . . The patient is warned about compliance with his medications and he has also been warned that he needs to discontinue his smoking, which he is actively doing and causing progression of his disease. . . . The patient will be monitored overnight, released in the morning and barring any complications, will follow back up in the office within a week to 10 days time.

(Tr. 233).

negative.  (*Id.*).  The ALJ reviewed Dr. Nimmagadda's notes from October 2010 indicating that Schnarr had occasional chest pain that was resolved with medication, but he still smoked a pack of cigarettes a day.  (*Id.*).

The ALJ cited records by Dr. Nimmagadda from a little over one year later, in January 2012, from a follow up appointment after a visit to the emergency room, where Dr. Nimmagadda noted Schnarr's complaints of head pain, swelling, and numbness but also that he had regular heart rate and rhythm and 140/80 blood pressure.  (*Id.*).  The ALJ noted that in July 2012, Dr. Nimmagadda recorded that Schnarr's blood pressure was 140/88 and that he was smoking.  (*Id.*).  Dr. Nimmagadda refilled Schnarr's medications for angina and hypertension in March 2013.  (*Id.*).  In April 2013, upon discharge following emergency treatment for chest pain, Schnarr felt well and denied symptoms.  (*Id.*).  The ALJ considered that in May 2013, Dr. Nimmagadda's findings included unremarkable cardiac signs, blood pressure at 124/74, and no report of shortness of breath, coughing, or wheezing.  (*Id.*).  The ALJ noted that Dr. Nimmagadda's records reflect Schnarr reporting "only occasional" angina and that in May 2015, Dr. Nimmagadda found Schnarr to have unremarkable cardiac signs.  (Tr. 17).

The ALJ also reviewed Dr. Rasak's treatment notes, including ones from October 2013 where Dr. Rasak found coronary artery stenosis, but that Schnarr had regular heart rhythm with no rubs, murmur, lifts, heaves, S3, or S4.  (Tr. 16).  The ALJ wrote that in January 2014, Dr. Rasak noted that Schnarr's electrocardiogram was abnormal and prescribed diet, no smoking, and medication.  (Tr. 16-17).  Dr. Rasak's impressions from a tilt table test included transient lightheadedness but otherwise negative results.  (Tr. 17).  The ALJ considered that in March 2014, Dr. Rasak found that Schnarr had a heart murmur but also regular rate and rhythm with no friction or rub and normal S1, S2, and S3.  (*Id.*).  A heart catheterization performed by Dr. Rasak

in July 2015 showed non-obstructive CAD with otherwise unremarkable results. (*Id.*). The ALJ recognized that Dr. Rasak routinely treated Schnarr's complaints of chest pain, palpitations, exertional dyspnea, wheezing, and fatigue, and noted that Dr. Rasak found "only a heart murmur with no other cardiovascular signs" in August 2015. (*Id.*). The ALJ determined that Dr. Rasak "noted some abnormal test results but repeatedly recorded relatively normal signs." (Tr. 18).

Moreover, the ALJ reviewed studies from October 2014, where duplex imaging showed that Schnarr had "reduction of the carotid and common arteries with plaque," but a stress test and echocardiogram showed normal results with an ejection fraction of 60%. (Tr. 17). The ALJ recognized that Schnarr had several cardiac stenting procedures, but concluded that they were "generally successful" in relieving his symptoms. (Tr. 18). The ALJ pointed out that at the time of Schnarr's alleged onset date, he was noted to have improved chest pain and a negative stress test despite almost continuous cigarette use. (*Id.*).

The ALJ's findings are supported by substantial evidence. Starting with Dr. Nimmagadda's own treatment records, her review of Schnarr's systems listed all or mostly all negative findings on more than one occasion. (Tr. 239, 243-49, 251-55, 257, 259, 398, 401, 411). While at times she noted that he had chest pain "on and off" that was resolved with Nitro and that by the end of 2010 was becoming less frequent (Tr. 268, 290-91), she later found Schnarr's review of systems negative for chest pain and palpitations (Tr. 243-49, 251-52, 253-55, 257, 405); negative for chest pain, claudication, edema, irregular heartbeat or palpitations (Tr. 398); and negative for cardiovascular auscultation. (Tr. 256, 258, 260). She also found that his heart was within normal limits. (Tr. 402, 405, 407, 409, 411).[4]

_____

[4] This citation does not include instances where Dr. Nimmagadda indicated that Schnarr's heart was within normal limits but simultaneously noted that he had chest pain or occasional angina. (Tr. 237, 239, 241).

On multiple occasions, Dr. Nimmagadda's physical examination of Schnarr revealed that his heart was regular (Tr. 264-65, 267, 269, 273, 290, 292-94, 297), that it had regular rate and rhythm (Tr. 243-54, 285), and that it was within normal limits.  (Tr. 238, 240, 401, 404, 406, 408, 410, 412).   She noted that he was in no acute distress.   (Tr. 267-68, 290-95).   Dr. Nimmagadda also recorded that Schnarr had no pedal edema or edema in the extremities (Tr. 256, 258, 260, 264, 266-67, 273, 290-91, 398-99) and no dyspnea.  (Tr. 398, 403).  On February 26, 2015, Dr. Nimmagadda's assessment was that Schnarr's hypertension and CAD were stable. (Tr. 401-02).  She instructed Schnarr to continue his medications.  (Tr. 401).  On May 21, 2015, during Schnarr's most recent visit to her office, Dr. Nimmagadda recorded entirely normal objective findings, including that his heart had regular rate and rhythm and no murmurs, gallops, or rubs.  (Tr. 399).  She opined that Schnarr's coronary atherosclerosis, hyperlipidemia, and hypertension were all either "stable" or "controlled."  (Tr. 398-99).  The ALJ did not err in determining that these records are inconsistent with the extreme limitations imposed in Dr. Nimmagadda's opinion.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997) (citing *Bogle v. Sullivan,* 998 F.2d 342, 347-48 (6th Cir. 1993) and *Cutlip*, 25 F.3d at 287).

Additional records support the ALJ giving little weight to Dr. Nimmagadda's opinion because they too contain findings that are inconsistent with the limitations imposed by Dr. Nimmagadda.  On June 13, 2011, Dr. Rasak interpreted Schnarr's films as showing some branch disease but overall normal left ventricular function and no heart failure.  (Tr. 330-31).  Dr. Rasak suspected that most of Schnarr's symptoms were caused by his lungs and not his heart and that Schnarr was not having "true angina."  (Tr. 331).  Given these findings, and that Schnarr's stents were patent, Dr. Rasak concluded that Schnarr was in no need of further cardiac intervention or revascularization and thought it would be "of little benefit . . . in the long run."  (Tr. 331-32).

17

Still, he warned Schnarr about the possibility of his condition progressing and requiring bypass surgery in the future if he continued to smoke.  (Tr. 331).  During that same visit, Dr. Rasak found that Schnarr's heart had regular rate and rhythm without rubs, clicks, and murmurs, and there was no S3 or S4 gallop.  (*Id.*).  His carotid pulses were present and equal bilaterally, there were no bruits or thrills noted, and no delay in upstroke.  (*Id.*).  Similarly, his pulses were present and equal bilaterally in both upper and lower extremities, and there were no bruits or thrills in his upper or lower extremities.  (*Id.*).  Dr. Rasak again made these findings on September 16, 2011, January 4, 2012, January 20, 2012, and April 24, 2013.  (Tr. 322, 324-26, 328).  Dr. Rasak generally noted that Schnarr had good capillary refill in both his upper and lower extremities. (Tr. 325-26, 328, 331).

On April 16, 2013, Schnarr was still smoking cigarettes and had recently gone to the emergency room due to chest pain.  (Tr. 213-14).  Upon examining Schnarr, Dr. Rasak found that his heart had regular rate and rhythm, S1 and S2 could be heard, and there were no murmurs, rubs, gallops, lifts, heaves, or bruits.  (Tr. 213).  Schnarr's hypertension was stable.  (*Id.*).  He had 5/5 strength and no atrophy.  (*Id.*).  That day, Schnarr had a "planned angioplasty," which he tolerated well.  (Tr. 214, 226).  The procedure reduced two 80% stenosis to 0% residual stenosis, and he had TIMI 3 grade flow, normal left ventricular systolic function, and normal functioning of the aortic root and ascending aorta.  (Tr. 212, 226).  Schnarr was discharged two days later, "feeling well and ambulating," and he "denied any symptoms."  (Tr. 212).  Later that month, on April 24, 2013, Dr. Rasak recorded that Schnarr was tolerating his medications well and "feels much better" since he has had cardiovascular testing done.  (Tr. 322).  A subsequent catheterization procedure done on October 22, 2013 had "an excellent result," with 0% residual stenosis (down from up to 90% narrowing and 80% residual stenosis), TIMI 3 grade flow, and no

dissection.  (Tr. 232-33); *see supra* note 3.  Two years later, on July 29, 2015, a catheterization resulted in no complications, after which Schnarr was in "stable and satisfactory condition."  (Tr. 370-71).  He was found to have non-obstructive CAD, patent stents with TIMI 3 grade flow, normal left ventricular function, normal left and right sided heart pressures, and there was no evidence of intracardiac shunt.  (Tr. 372).  On August 10, 2015, his stents were patent, his pressures were good, and his ejection fraction was good.  (Tr. 342).

In his motion, Schnarr points to a list of "cardiac-related disorders" that appear in Dr. Rasak's August 10, 2015 treatment notes and argues that they all "would severely limit [Schnarr's] activity" and are therefore "fully consistent with Dr. Nimmagadda's limitations." (Doc. #16 at 19).  But as the Commissioner points out, Dr. Rasak's list of diagnoses contains no reference to functional limitations resulting from such conditions.  (Doc. #18 at 17-18).  Dr. Rasak did not limit Schnarr's activity level based on his diagnoses.  Instead, in many of Dr. Rasak's records that include the list of diagnoses Schnarr highlights, Dr. Rasak encouraged him to lose weight by exercising.  (Tr. 303, 308, 313, 320, 327, 329, 363, 368, 422, 426-27, 430-31, 433-34).  Moreover, other portions of these records by Dr. Rasak are inconsistent with Dr. Nimmagadda's extreme limitations.  For example, on November 7, 2013, Dr. Rasak noted the presence of a grade II/VI systolic flow murmur but also found that Schnarr's heart had regular rate and rhythm, no pericardial friction rub, normal S1 and S2, no S3 present, and that his carotid arteries, abdominal aorta, femoral arteries, and pedal pulses were normal.  (Tr. 319).  Dr. Rasak made these same findings eight more times over the next two years.  (Tr. 302, 307, 312, 345, 350, 356, 362, 367).  Dr. Rasak also regularly noted that Schnarr had a normal gait and was able to stand without difficulty.  (Tr. 307, 312, 320, 345, 356, 362, 367).

Schnarr argues that Dr. Rasak's indication that peripheral vascular disease would require

him to elevate his legs "clearly would have impacted [his] ability to stand, and even sit in many instances, while working."  (Doc. #16 at 19).  Schnarr criticizes the ALJ for not considering this particular indication, which he contends is "fully consistent with Dr. Nimmagadda's limitations." (*Id.*).  But Schnarr's assertion is inaccurate; Dr. Nimmagadda expressly opined that Schnarr did not need to elevate his legs during an eight-hour workday.  (Tr. 236).

The findings of other physicians also support the ALJ's decision to discount the limitations imposed by Dr. Nimmagadda.  An examination on April 16, 2013, by Malitha Hettiarachchi, M.D., notes that Schnarr's heart had regular rate and rhythm, S1 and S2 were normal, and there were no audible murmurs.  (Tr. 218).  On October 3, 2013, a stress test performed by M. Imran Qureshi, M.D., resulted in an abnormal myocardial perfusion study but had otherwise normal results, such as no chest pain reported, a normal hemodynamic response to the Lexiscan infusion, no malignant arrhythmias, and normal left ventricular function.  (Tr. 314).  Also on October 3, 2013, Nenad Serafimovski, M.D., made multiple normal findings.  (Tr. 316).  Consultation notes from October 22, 2013 by Gary R. Goodman, M.D., report that Schnarr's heart had regular rhythm; no rubs, murmurs, or gallops; no lifts or heaves; no S3 or S4; and the point of maximal impulse was not displaced.  (Tr. 228).  Dr. Goodman did not recommend surgical revascularization and, like Dr. Rasak, encouraged Schnarr to exercise.  (*Id.*).

On May 2, 2014 consultative examiner Mary C. Wood, M.D., noted that Schnarr had CAD, with status post ten stents, but found that his heart had normal sinus rhythm and no murmur.  (Tr. 336-37).  On October 6, 2014, Michael Abdul-Malek, D.O., summarized the results from an electrocardiogram as displaying "[n]or[m]al left ventricular and right ventricular systolic function," with a 60% ejection fraction.  (Tr. 395-96).  A stress test performed on October 13, 2014 demonstrated improvement from the stress test the year before; it resulted in a

normal myocardial perfusion study, a negative EKG, no chest pain reported, normal hemodynamic response to the Lexiscan infusion, no malignant arrhythmias, and normal left ventricular function. (Tr. 394). Dr. Harber concluded that compared to the previous study from October 3, 2013, "the reversible inferior/lateral defect is no longer present." (*Id.*).

### ii.  Back Condition

Schnarr argues that the ALJ was "inappropriately" selective in his handling of Dr. Nimmagadda's opinion as to Schnarr's back impairment. (Doc. #16 at 19). In giving little weight to Dr. Nimmagadda's opinion, the ALJ noted that Dr. Nimmagadda had "initially prescribed pain medication to be used only as needed and added exercise for [Schnarr's] ongoing pain complaints that had relatively little signs, including negative straight-leg raising and a normal gait." (Tr. 19). As discussed below, the ALJ satisfied the "good reasons" requirement and his assessment is supported by substantial evidence.

The ALJ supported his decision with specific references to Schnarr's medical records. The ALJ noted that Schnarr had radiating back pain after a fall in November 2008 and that Dr. Nimmagadda found that he had paraspinal spasm and tenderness but a negative straight-leg raise and no edema. (Tr. 17). The ALJ considered that in March 2009, Dr. Nimmagadda wrote that an MRI had shown degenerative disc disease. (*Id.*). The ALJ considered that Schnarr complained of back pain radiating to his legs and that in November 2009, Dr. Nimmagadda found that he had a negative straight-leg raise but prescribed pain medication "to be used as needed." (*Id.*). The ALJ wrote that in October 2010, Dr. Nimmagadda recorded that Schnarr had lumbar tenderness and mild spasm but a negative straight-leg raise and normal gait. (*Id.*). She prescribed exercise for his complaints of ongoing pain. (*Id.*). The ALJ took note of the fact that in December 2013, Schnarr reported having constant back pain but Dr. Nimmagadda made

normal musculoskeletal findings.  (*Id.*).   In January 2014, while Schnarr complained of back, heel, and leg pain and said he was unable to sit for long periods, Dr. Nimmagadda found him to be only a little off balance, with a negative Romberg test.  (*Id.*).

The ALJ also reviewed a May 2014 report by Dr. Wood, where she noted Schnarr complained of back and knee weakness as well as pain that limited his ability to do prolonged sitting and standing and that precluded him from kneeling.  (*Id.*).   The ALJ considered Dr. Wood's assessment that Schnarr had crepitus in his knees and slight right knee swelling, but no striking spinal abnormalities, tenderness, or spasm.  (*Id.*).   He also considered that Dr. Wood's diagnoses included lumbar spine degeneration and early osteoarthritic knees.  (*Id.*).

Schnarr argues that the ALJ erred by not considering every single finding made by Dr. Wood.  (Doc. #16 at 19-20).   Schnarr focuses in particular on Dr. Wood's notation that his "straight leg raising was positive at 70° bilaterally" and that he had limited range of motion in the lumbar spine.  (*Id.*).   Schnarr also seems to argue that the ALJ erred by not considering the results of an abnormal MRI[5] and a May 2014 CT scan, where the latter "revealed degenerative changes in the lumbar spine, with disc narrowing at L3-L4 and L4-L5."  (*Id.* at 20).   In making these arguments, Schnarr accuses the ALJ of the "critical error" of "cherry picking":  he claims that instead of considering all of the evidence, the ALJ "opt[ed] to select for citation only those findings that supported his conclusion, while ignoring those that did not – even when they did support the findings of a treating physician."  (*Id.*).

"It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"  *Gordon v. Comm'r of Soc. Sec.*, No. 14-11990, 2015 WL 5335477, at *14 (E.D. Mich. Aug. 12, 2015) (quoting *Smith*

---

[5] As noted above, in reality, the ALJ did consider Schnarr's March 2009 MRI results.

*v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at \*6 (N.D. Ohio Mar. 11, 2013)). But "the ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Id.* (quoting *Solembrino v. Astrue*, No. 1:10-CV-01017, 2011 WL 2115872, at \*8 (N.D. Ohio May 27, 2011); citing *Smith*, 2013 WL 943874, at \*6 and *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). "[I]t is not uncommon in disability cases for there to be some inconsistencies in the record," and it is the ALJ's duty "to resolve any inconsistencies in the evidence." *Id.* The Court cannot conduct a *de novo* review of the record evidence, and an ALJ's findings are "not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Id.* (citing *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001)); *Cosma v. Comm'r of Soc. Sec.*, No. 14-11787, 2015 WL 5693664, at \*3 (E.D. Mich. Sept. 29, 2015) ("Indeed, courts have recognized that allegations of cherry picking are seldom successful because they call for the court to re-weigh the evidence." (citing *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 725 (6th Cir. 2014))). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Gordon*, 2015 WL 5335477, at \*14 (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). In weighing the evidence, an ALJ "should consider the record as a whole" and is "not required to discuss every medical record in detail." *Jones v. Astrue*, No. 1:11-cv-228, 2012 WL 2133592, at \*9 (S.D. Ohio June 12, 2012).

Here, the ALJ properly considered Dr. Wood's opinion and was not required to discuss every aspect of her findings in detail when he weighed the evidence in the record. Moreover, findings made by Dr. Wood beyond those mentioned by the ALJ, and other evidence in the record, support the ALJ's decision to give Dr. Nimmagadda's opinion little weight. For instance, Dr. Wood reported that Schnarr complained of joint pain, but also noted that he "was ambulatory

with no assistance device," his gait was stable and within normal limits, and he could walk on heels and toes and tandem walk. (Tr. 335-36, 339). Her examination of his cervical, dorsal, and lumbosacral spines "clinically did not reveal any striking abnormalities." (*Id.*). She found that "[t]here was no paraspinal muscle tenderness or spasm." (*Id.*). Although she noted that his lumbar spine's range of motion was somewhat restricted (Tr. 340), she opined that Schnarr could sit, stand, stoop, carry, push, pull, dress and undress, open a door, squat and arise from squatting, get on and off an examination table, and climb stairs; the only activity that was reduced was his ability to bend, due to his degenerative disc disease, although Dr. Wood still affirmatively indicated that Schnarr could perform this activity. (Tr. 338).

The ALJ also considered Schnarr's own testimony regarding his back problems – for instance, that Schnarr could not do prolonged standing without sitting or walking for pain relief and that he could sit for thirty minutes, stand for fifteen minutes, and walk one block. (Tr. 16). That the ALJ considered these statements made by Schnarr runs counter to Schnarr's "cherry picking" argument that the ALJ only considered documents that support his conclusion. Other record evidence also supports the ALJ's analysis. For instance, on November 18, 2010, Dr. Nimmagadda noted that Schnarr denied lower back pain, which was consistent with her objective findings of no tenderness in his lower spine at L4-L5, and that his gait was within normal limits. (Tr. 268-69). On numerous other occasions, Dr. Nimmagadda recorded that Schnarr's musculoskeletal exam was negative or within normal limits[6] and that he had no myalgia. (Tr. 227, 242, 253-55, 259, 404, 412). Rather than limiting Schnarr's physical exertion, Dr. Nimmagadda encouraged him to exercise. (Tr. 290-91, 399).

In sum, because the ALJ reviewed the entire record and his decision is supported by

---

[6] During other visits, Dr. Nimmagadda found that Schnarr's musculoskeletal system was within normal limits, but noted he had pain in his foot, shoulder, or back. (Tr. 237, 239, 401, 406, 408).

substantial evidence, Schnarr's "cherry picking" argument fails.

Schnarr also criticizes the ALJ for relying upon a straight-leg raising test that "was recorded in a note from November 2009 . . . – six years before the ALJ's decision."[7]  But for DIB, "[i]n determining whether a Plaintiff is 'disabled,' the ALJ generally only considers evidence from the alleged disability onset date through the date last insured." *Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 716 n.8 (S.D. Ohio 2012) (citing *King v. Sec'y of Health & Human Servs.*, 896 F.2d 204, 205-06 (6th Cir. 1990)).  Here, Schnarr's alleged disability onset date is March 31, 2009.  It was therefore proper for the ALJ to consider a medical record from November 2009.  Moreover, the regulations provide that an ALJ is to "consider all evidence in [a claimant's] case record when [he] make[s] a determination or decision whether [the claimant is] disabled."  20 C.F.R. § 404.1520(a)(3) (citing 20 C.F.R. § 404.1520b).  Thus, the regulations do not impose a time frame for what records an ALJ is allowed to consider, based on when his decision is issued.  Accordingly, this argument by Schnarr lacks merit.

### b.  Dr. Rasak's Opinion

#### i.  *Disability Opinion*

On August 10, 2015, Dr. Rasak made the following bullet point notation under a heading called "Plan" and a subheading called "Instructions":  "multiple medical issues including angina/COPD/DJD/Claudication with PAD --> agree with disability."  (Tr. 346).  Schnarr takes issue with the ALJ not giving this opinion on disability controlling weight.  (Doc. #16 at 16).

"The determination of disability is [ultimately] the prerogative of the [Commissioner],

---

[7] Dr. Nimmagadda found that Schnarr's straight-leg raising was negative one year later, on October 11, 2010.  (Tr. 291).  In the portion of his decision that is at issue, the ALJ does not specify whether he is referring to the November 2009 or October 2010 negative straight-leg raising test – or both.  (Tr. 19).  Regardless, the ALJ explicitly considered both test results earlier in his decision.  (Tr. 17).

not the treating physician." *Warner*, 375 F.3d at 390 (quoting *Harris v. Heckler,* 756 F.2d 431,

435 (6th Cir. 1985)).  Thus, statements by a treating physician that a claimant is unable to work

"are entitled to no deference because the determination of disability is a matter left to the

Commissioner."  *See Stojic v. Comm'r of Soc. Sec.*, No. 14-1133, 2015 WL 9238986, at *4

(W.D. Mich. Dec. 17, 2015) (citing 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical

source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner]

will determine that [the claimant is] disabled.")); *Bass*, 499 F.3d at 511 (internal citations

omitted) ("20 C.F.R. § 404.1527(e)(1) explicitly states that the conclusion of disability is

reserved to the [Commissioner]," and "[s]ubsection (e)(3) further elaborates that no 'special

significance' will be given to opinions of disability, even if they come from a treating

physician."); *see* SSR 96-5p, 1996 WL 374183 (July 2, 1996).

Here, the ALJ properly considered Dr. Rasak's conclusion regarding disability (Tr. 19)

but was under no obligation to adopt it because "the ultimate decision of disability rests with the

ALJ."  *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 786 (6th Cir. 2009).  Furthermore, the

ALJ reasonably explained that he gave this opinion little weight "because it is not well supported

by, or consistent with, the medical evidence of record," which is addressed above, and Schnarr's

"admitted active daily activities," which are addressed below.  (Tr. 19).

### ii.  Activities of Daily Living

The ALJ gave little weight to Dr. Rasak's opinion that Schnarr has "multiple medical

issues supportive of disability," finding that "[t]his opinion is . . . not consistent with [Schnarr's]

admitted active daily activities he could do personal care, shop, cook, clean, drive, hunt, fish,

play cards and watch television."[8]   (Tr. 19).   The Court discerns no error in the ALJ's handling

of this issue.   Schnarr argues that the ALJ impermissibly relied on activities performed

sporadically or that require sporadic exertion, where "[t]he ability to engage in [activities] on an

extremely intermittent basis does not necessarily equate to an ability to perform substantial

gainful activity on a regular and sustained basis."   (Doc. #16 at 21).   But the purpose of the

ALJ's assessment in this part of his decision was not to evaluate Schnarr's ability to perform

substantial gainful activity; the purpose was to (1) evaluate Schnarr's credibility – in other

words, the consistency of his activities with his professed limitations – and (2) determine how

much weight to give Dr. Rasak's opinion based on its consistency with the overall record.   SSR

96-7p, 1996 WL 374186, at *3 (July 2, 1996)[9]; 20 C.F.R. § 404.1529(c)(3)(i).

Moreover, as the Commissioner points out, it was proper for the ALJ to inform his

assessment of Schnarr and his treating source's opinions by reviewing Schnarr's activities of

daily living and determining whether the activities are "inconsistent with the limitations

proposed by those treating sources and . . . taken with other evidence of record, support[] [his]

ability to perform a certain level of work."   *Engebrecht v. Colvin*, No. 12-11342, 2013 WL

4604597, at *21 (E.D. Mich. Aug. 29, 2013), *aff'd sub nom. Engebrecht v. Comm'r of Soc. Sec.*,

572 F. App'x 392 (6th Cir. 2014).   *See also* SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996)

(requiring the ALJ to consider the claimant's daily activities in assessing the credibility of his

---

[8] Schnarr interprets this sentence as referring to the opinions of both Dr. Nimmagadda and Dr. Rasak (Doc. #16 at 21), but the ALJ is referring to Dr. Rasak's opinion.  (Tr. 19).

[9] The Commissioner accurately states that SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996), was superseded by SSR 16-3p, 2016 WL 1119029 (March 16, 2016), which became effective on March 28, 2016.  (Doc. #18 at 26 n.2).  Because SSR 96-7p was in effect on the date of the ALJ's October 22, 2015 decision, the Court will reference this earlier ruling in its analysis.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[A]dministrative rules will not be construed to have retroactive effect unless their language requires this result.").

statements); 20 C.F.R. § 404.1529(c)(3)(i).  The Sixth Circuit has held that a claimant's ability to manage his personal hygiene, perform daily house chores, and participate in social activities weighs against a finding of disability.  *Cole v. Comm'r of Soc. Sec.*, No. 1:15-cv-833, 2016 WL 5334593, at *6 (W.D. Mich. June 23, 2016) (finding that activities such as cleaning, cooking, making beds, fixing things "at [the claimant's] own time" "are not indicative of an invalid, incapable of performing work related activities" (citing *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 846 (6th Cir. 2005); *Warner*, 375 F.3d at 392; *Bogle*, 998 F.2d at 348; *Gist v. Sec'y of Health & Human Servs.*, 736 F.2d 352, 358 (6th Cir. 1984))).  The Sixth Circuit has also found that where an ALJ cited a claimant's ability to drive, care for his personal needs, and perform other activities of daily living, his adverse-credibility determination was supported by substantial evidence.  *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 438 (6th Cir. 2012) ("[T]he ALJ identified specific facts supported by the record which cast doubt on the severity of the disabilities as described by [the claimant].  Because 'a reasonable mind might accept [the evidence] as adequate to support' an adverse-credibility determination, we conclude that substantial evidence supports the ALJ's finding.").  As elaborated above, the record reflects that Schnarr takes care of his personal needs, prepares his own meals, and drives.  (Tr. 32, 41-42, 174-76).  He does laundry in his basement, mows his lawn, and goes grocery shopping.  (Tr. 39, 42, 175-76).  He took four four-hour trips to Manistee, Michigan in the few months prior to the hearing in this matter, and he fishes and hunts (though not as frequently as he did in the past).  (Tr. 43-44, 177).  In light of the case law discussed above, the ALJ did not err in considering these "intermittent" activities as part of his credibility determination.[10]  The ALJ likewise

---

[10] In a footnote on the second-to-last page of Schnarr's brief, he raised an additional credibility argument.  (Doc. #16 at 24 n.2).  Schnarr argues that there were two other factors that the ALJ inappropriately considered in finding him not credible:  (1) Schnarr's performance of part-time

work below substantial gainful activity levels; and (2) Schnarr's "unsuccessful" search for work. (*Id.*).  Schnarr explains his reasoning for this argument in a single sentence:  "Disability cannot be disproven by part-time work, SSR 96-8p, and it is difficult to understand how [Schnarr's] inability to find work that he could do somehow proves that such work existed."  (*Id.*).  Even assuming this one-sentence argument is not waived, *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006), it lacks merit.

The ALJ considered Schnarr's part-time work and attempts to find work in assessing his credibility as follows:

> [Schnarr] worked after the alleged onset date and, although it did not constitute disqualifying [substantial gainful activity], it does indicate his daily activities have been somewhat greater than he generally reported . . . . He also testified he made extensive attempts to find work, which indicates he felt able to work.  [Schnarr's] apparent attempts to find work while alleging an inability to work during the same period brings into question the reliability of his allegations generally.  I find [Schnarr's] allegations credible only to the extent they are consistent with the above RFC.

(Tr. 18).

Schnarr has shown no error by the ALJ in making this credibility finding.  An ALJ may consider a claimant's work history in assessing his credibility.  *Perrault v. Comm'r of Soc. Sec.*, No. 1:14-CV-942, 2015 WL 5592931, at *6 (W.D. Mich. Sept. 22, 2015); 20 C.F.R. § 404.1529(c)(3) ("We will consider all of the evidence presented, including information about your prior work record . . . .").  Along those lines, an ALJ may consider that the claimant worked part time, even if below the level of substantial gainful activity, in concluding that a claimant's credibility is lacking.  *Caldwell v. Comm'r of Soc. Sec.*, No. 15-13015, 2016 WL 4150031, at *11 (E.D. Mich. June 30, 2016) ("While [the claimant's part-time work] did not rise to the level of substantial gainful activity, the ALJ properly concluded that it undercut [his] credibility insofar as it demonstrated his ability to complete at least some work" and "call[ed] into question his allegation that he cannot walk further than his porch without rest, and his assertion at the hearing that he could walk only ten to twenty steps.").  The Court also notes that Schnarr admitted that he stopped working full time not because of a physical inability to do so, but because he was laid off due to "economic reasons."  (Tr. 34).  Thus, the ALJ committed no error by considering Schnarr's part-time work in assessing his credibility.

Schnarr's argument that under SSR 96-8p, 1996 WL 374184 (July 2, 1996), "[d]isability cannot be disproven by part-time work" lacks merit.  SSR 96-8p "only indicates that the ALJ must make the RFC determination on the basis of full-time and not part-time work."  *DeRossett v. Astrue*, No. 7:09-CV-00046-KKC, 2009 WL 4169489, at *5 (E.D. Ky. Nov. 20, 2009) (citing SSR 96-8p, 1996 WL 374184 (July 2, 1996)).  Rather than infer from Schnarr's ability to do part-time work that he could perform work on a sustained, full-time basis, the ALJ in this case appropriately determined that Schnarr's part-time work was one of several factors that negatively

committed no error when he determined that Schnarr's activities of daily living are inconsistent with Dr. Rasak's disability opinion.

### c.  Dr. Digby's Opinion

On May 22, 2014, non-examining consultant Dr. Digby determined that Schnarr is not disabled based on a review of his medical records.  (Tr. 60-72).  The ALJ specifically considered Dr. Digby's opinion as follows:

> As for the opinion evidence, Disability Determination Services (DDS) physician, R.H. Digby, M.D., opined in May 2014, [that Schnarr] was limited to light work with occasional postural activities but frequent handling and fingering.  Dr. Di[g]by also opined that [Schnarr] must avoid concentrated exposure to extreme cold, vibration and irritants such as fumes, odors, dusts and gases and even moderate exposure to hazards . . . . I give great weight to this opinion because of this assessor's familiarity with the disability program, opportunity to evaluate the record and consistency with the medical evidence, as later information did not support altering the claimant's RFC.

(Tr. 18).  In Schnarr's view, the reasons the ALJ provided for adopting Dr. Digby's findings are "less than enlightening."  (Doc. #16 at 22).  Schnarr argues (without citing any legal authority)

---

impacted his credibility.  *See Williamson v. Comm'r of Soc. Sec.*, No. 1:16-cv-583, 2017 WL 713904, at \*3-4 (S.D. Ohio Feb. 23, 2017).  Schnarr has presented no evidence that the RFC and/or the ALJ's determination of "not disabled" were based on his ability to perform part-time work.  *See DeRossett*, 2009 WL 4169489, at \*5-6.

As to the ALJ considering his search for work, Schnarr cites no legal authority for his position that this was inappropriate.  (Doc. #16 at 24 n.2).  Again, the ALJ merely noted that Schnarr's "apparent attempts to find work while alleging an inability to work during the same period brings into question the reliability of his allegations generally."  (Tr. 18).  Thus, the ALJ considered his "extensive attempts to find work, which indicate[] he felt able to work," to assess his credibility, or "the degree to which [an individual's statements about pain or other symptoms and their functional effects] can be believed and accepted as true" – not to determine whether he was disabled.  (Tr. 18); SSR 96-7p, 1996 WL 374186, at \*4 (July 2, 1996).  Under SSR 96-7p, 1996 WL 374186, at \*4 (July 2, 1996), an ALJ "must consider the entire record" when evaluating the credibility of an individual's statements.  In addition, it is appropriate for the ALJ to consider factors such as the consistency of the claimant's own statements.  *Id.* at \*5-6 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").  Given that this is exactly what the ALJ did, Schnarr's argument is without merit.

that Dr. Digby's "familiarity with the disability program should have no bearing upon his determination as to the limitations needed by [Schnarr]" because "[t]he program does not make that determination, and the 'program' is only applied once the limitations are established." (*Id.*). Schnarr believes that greater weight should have been given to the opinions of Dr. Nimmagadda and Dr. Rasak because they had the opportunity to examine him, "personally observing his course over time," as opposed to simply examining the record, which is what Dr. Digby did. (*Id.*). And as to the issue of a treating physician's consistency with the record, Schnarr questions the ALJ's consistency analysis, stating: "the ALJ's selective review of the record renders his suggestion of consistency suspect at best." (*Id.*). The Court has already explained why Schnarr's arguments regarding the weight given to the opinions of Dr. Nimmagadda and Dr. Rasak and the alleged "cherry picking" of the record by the ALJ lack merit. Schnarr's argument regarding the weight given to Dr. Digby's opinion similarly gets him nowhere.

"Social Security regulations recognize that opinions from non-examining state agency consultants may be entitled to significant weight, because these individuals are 'highly qualified' and are 'experts in Social Security disability evaluation.'" *Rios v. Comm'r of Soc. Sec.*, No. 1:16-CV-171, 2016 WL 6310280, at *3 (W.D. Mich. Oct. 28, 2016) (internal quotations omitted). Thus, an ALJ is "free to consider the consultant's opinion and determine what weight, if any, it should be given." *Thiele v. Berryhill*, No. 1:16CV00942, 2017 WL 1207977, at *16 (N.D. Ohio Mar. 10, 2017); 20 C.F.R. §§ 404.1545-404.1546. Given that this is precisely what the ALJ did in this case, his consideration of Dr. Digby's opinion in formulating the RFC was valid. Moreover, the ALJ was entitled to rely on Dr. Digby's opinion because the ALJ determined that the opinions of Schnarr's treating physicians are not well supported by the medical evidence, whereas Dr. Digby's opinion was "consisten[t] with the medical evidence"

and "later information did not support altering [Schnarr's] RFC."[11]  (Tr. 18); *Kilkolski*, 2016 WL

6080217, at *9 (quoting *Dyer*, 568 F. App'x at 428), *report and recommendation adopted*, 2016

WL 1357900, at *6; *Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 415 (6th Cir. 2004)

("State agency medical consultants are considered experts and their opinions may be entitled to

greater weight if their opinions are supported by the evidence." (citing 20 C.F.R. §

404.1527(f)(2)(i))).

In sum, substantial evidence supports the ALJ's evaluation of Dr. Nimmagadda's and Dr.

Rasak's opinions.  The ALJ provided "good reasons" that make it clear he gave limited weight to

their opinions because he found they were inconsistent with the record evidence, including the

medical evidence, and Schnarr's testimony and self-reports.  *Rogers*, 486 F.3d at 242 (quoting

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

> ## 2.    *The ALJ did not Fail to Account for Schnarr's Carpal Tunnel Syndrome and its Effect on his Ability to Work*

Schnarr criticizes the ALJ for allegedly not analyzing his carpal tunnel syndrome and for

"never mention[ing] [Schnarr's] carpal tunnel syndrome in his severe impairment analysis."

(Doc. #16 at 23).  In Schnarr's opinion, further consideration of this condition is "required"

because it was diagnosed by both Dr. Nimmagadda[12] and Dr. Wood, and according to Dr.

Nimmagadda's opinion, she "would have limited [Schnarr] to only occasional fine and gross

---

[11] Indeed, as the Commissioner points out (Doc. #18 at 23), Dr. Nimmagadda's and Dr. Rasak's records that post-date Dr. Digby's May 22, 2014 opinion indicate mostly normal or "within normal limits" findings.  (Tr. 344-45, 350, 356, 362, 366-67, 371-72, 398-99, 401-10).  In addition, an echocardiogram and Lexiscan performed in October 2014 had normal and/or improved results.  (Tr. 394-95).

[12] Schnarr does not cite to where in the record Dr. Nimmagadda diagnosed him with carpal tunnel syndrome.  (Doc. #16 at 23).  Dr. Nimmagadda did, however, record Schnarr's complaint of numbness in both hands on June 21, 2007 (before his alleged onset date) and again on January 21, 2014.  (Tr. 239, 276).

manipulation."  (*Id.* at 23-24).  Schnarr also believes remand is appropriate because even though Dr. Digby did consider the impact of carpal tunnel syndrome, Dr. Digby "did not have the benefit of [Schnarr's] hearing testimony, during which he indicated that his hands were 'numb 24/7' as the result of 'really bad' carpal tunnel syndrome."  (*Id.*).

As an initial matter, the Court disagrees with Schnarr's assertion that "[a]t no point did [the ALJ] analyze . . . [Schnarr's] carpal tunnel syndrome."  (Doc. #16 at 23).  In the RFC, the ALJ explicitly limited Schnarr to "frequent[] handl[ing] and finger[ing] with both hands."  (Tr. 15).  Within the ALJ's RFC analysis, the ALJ noted that Schnarr's testimony mentions problems with "left hand numbness" (Tr. 16), Dr. Nimmagadda's medical records note complaints of "hands numbness" (Tr. 17), and Dr. Digby found that Schnarr could perform "frequent handling and fingering."  (Tr. 18).

Regarding Dr. Nimmagadda's and Dr. Wood's diagnoses, "disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it."  *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)).  Thus, the ALJ was not obligated to list Schnarr's carpal tunnel syndrome as a severe impairment at Step Two merely because Dr. Nimmagadda and Dr. Wood diagnosed him with it. Moreover, in formulating her RFC, the ALJ properly chose to give little weight to Dr. Nimmagadda's opinion that Schnarr was limited to "only occasional fine and gross manipulation."  Evidence of functional limitations resulting from carpal tunnel syndrome is lacking in Dr. Nimmagadda's notes.  And, although Dr. Wood included bilateral carpal tunnel in her list of diagnoses (Tr. 337), she also found that the flexion and extension in both of Schnarr's hands, wrists, and fingers were within normal limits.  (Tr. 341).  Dr. Wood further opined that Schnarr was capable of buttoning clothes, tying shoes, dialing a telephone, opening a door,

making a fist, picking up a coin, picking up a pencil, and writing.  (Tr. 338).  Indeed, in Schnarr's own Function Report, he did not check boxes indicating that his conditions affect his ability to reach and use his hands.  (Tr. 178).

As to Schnarr's argument that Dr. Digby was not in a position to consider his testimony regarding his carpal tunnel syndrome, Schnarr cites to no case law or applicable ruling or regulation that mandates remand on this basis.  Dr. Digby already opined that Schnarr had bilateral manipulative limitations in terms of gross manipulation (handling) and fine manipulation (fingering) (Tr. 68-69), and the ALJ gave Dr. Digby's opinion great weight.  (Tr. 18).  Schnarr fails to show how Dr. Digby's consideration of his testimony would have altered Dr. Digby's opinion, and in turn, how it would have changed the ALJ's assessment.  *Hill*, 560 F. App'x at 551-52 (claimant's "cursory argument that the ALJ failed to denote PTSD as a severe limitation is waived" where he "cites no evidence or authority to show that inclusion of PTSD as a severe impairment would have changed the ALJ's assessment of her functional limitations" (citing *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006))).

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [18] be GRANTED, Schnarr's Motion for Summary Judgment [16] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: November 28, 2017                        s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 28, 2017.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager